Nos. 04-1613 and 04-1671
File Name: 05a0694n.06
Filed: August 11, 2005

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| J. MICHAEL CHASE, J. MICHAEL CHASE & ASSOCIATES, INC., a Michigan corporation, | ) ) ) |
| Plaintiffs-Appellants/ Cross-Appellees, | ) ) |
| v. | ) ) ) |
| MATSU MANUFACTURING, INC. a Division of MATCOR AUTOMOTIVE, INC., and MATCOR AUTOMOTIVE INC., foreign corporations, jointly and severally, | ) ) ) ) |
| Defendants-Appellees/ Cross-Appellants. | ) ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:  GIBBONS, COOK, CIRCUIT JUDGES; AND PHILLIPS, DISTRICT JUDGE[*]

**PHILLIPS, District Judge**.

Plaintiffs-appellants, J. Michael Chase ("Mr. Chase") and J. Michael Chase &

Associates, Inc. ("JMC&A"), appeal the district court's summary judgment ruling that

defendants-appellees, Matsu Manufacturing, Inc. ("Matsu") and Matcor Automotive, Inc.

("Matcor"), were excused from paying future commissions on existing ("old") and "new"

business when Mr. Chase became "inactive."  Defendants appeal the district court's ruling

that allowed plaintiffs leave to amend the complaint to state a claim for statutory damages

[*]The Honorable Thomas W.  Phillips, United States District Judge, Eastern District of Tennessee, sitting by designation.

under the Michigan Sales Representative Act ("MSRA"), M.C.L. § 600.2961.  For the

reasons set forth below, we **AFFIRM** the orders of the district court.


## I.  Background and Procedural History

After 30 years at General Motors ("GM"), 28 of those years in the purchasing

department, Mr. Chase retired in 1990 and began working as a sales representative on

behalf of automotive suppliers seeking to do business with GM.  In 1994, Mr. Chase was

introduced to Arthur Artuso ("Mr. Artuso"), an owner of Matsu and Matcor, Canadian

suppliers of metal vehicle stampings, brackets and part assemblies.[1]  Defendants had not

been successful in selling to GM and were interested in hiring Mr. Chase.  After a meeting

with defendants in Canada, Mr. Chase received a proposed written sales representative

agreement drafted by Mr. Artuso.  When Mr. Chase asked if he could have time to let an

attorney review the proposed contract, Mr. Artuso replied "I wouldn't appreciate that."  So

on September 1, 1994, without attorney review, Mr. Chase signed the agreement.


The sales representative agreement provided that "[t]his commission shall remain in

effect as long as Mr. Chase continues to act as the exclusive sales agent for Matsu

Manufacturing" and further indicated that "if Mr. Chase becomes inactive in the sales

management activities surrounding Matsu Manufacturing, his commissions on new

---

[1]Matsu and Matcor are sister corporations.  They have the same shareholders and officers.  Two shareholders, Mr. Artuso and Galli Tiberini, each own fifty percent of both companies.

business will cease to be paid." According to plaintiffs, Mr. Chase understood that he was to be the independent exclusive sales agent for defendants in dealing with GM. Mr. Chase further claims the contract entitled him to sales commissions for the "life of the parts" he sold, even if he stopped working or was terminated. Defendants argue, however, that post-termination "life of the part" commissions were to be provided to Mr. Chase or his heirs only in the limited circumstance that Mr. Chase became unable to act as a sales agent because of his incapacity or death, at which time he or his heirs would be paid 50% of his commissions for the life of the parts he had sold. According to their interpretation of the contract, defendants assert that if Mr. Chase became "inactive" for any other reason, his commissions would cease. The sales representative agreement had no explicit termination provisions.

Plaintiffs succeeded in convincing GM to buy defendants' products and apparently were directly responsible for defendants' increased revenue. Mr. Artuso appeared genuinely pleased with plaintiffs' efforts and there is no written documentation of record expressing any criticism of Mr. Chase. However, in 2001, Mr. Artuso asked Mr. Chase to retire, apparently because he felt Mr. Chase had become "ineffective."[2] In response, Mr. Chase told Mr. Artuso he could not retire at that time because of stock market declines. Subsequently, on December 10, 2001, Mr. Artuso informed Mr. Chase by memo that his

---

[2]Mr. Artuso was not satisfied with Mr. Chase's efforts toward new sales and his attentiveness to the business the defendants already had.

3

employment with defendants was terminated effective immediately.  Defendants refused to pay any additional commissions to plaintiffs, either on existing or future GM business.

Plaintiffs claim that at the time Mr. Chase was fired, numerous contracts with GM were still in effect, providing substantial business to defendants.  According to Mr. Chase, once GM awards a contract for a stamping part, unless there is a significant design change, the original seller will get the first opportunity to make any modifications and continue to produce that part.  He indicated that structural components, such as those sold by defendants, will generally stay the same for the life of the vehicle.  Plaintiffs also assert that a number of outstanding, active quotations for contracts had not yet been accepted or rejected by GM at the time of Mr. Chase's termination.

Plaintiffs sued defendants in state court alleging claims for (1) breach of contract; (2) recovery under the "procuring cause" doctrine; (3) declaratory judgment regarding post-termination commissions; and (4) an accounting.  Plaintiffs specifically sought alleged unpaid sales commissions to December 31, 2001, and post-termination commissions on existing contracts with GM.  Defendants answered the complaint in January 2002 and filed a counterclaim.

The case was removed to federal court and the parties filed cross-motions for summary judgment.  In their motion, plaintiffs contended that defendants could not make

Mr. Chase "inactive" under the agreement by firing him, because they had a duty to not hinder Mr. Chase's performance under the contract. Defendants took the position in their motion that they could terminate Mr. Chase's services and that once he was fired, Mr. Chase was "inactive" and no longer entitled to any commissions.[3] In an Opinion and Order dated October 3, 2003, the district court granted in part and denied in part both parties' motions.[4] The district court found that the agreement between the parties was an indefinite terminable "at will" contract and that either party could terminate it at any time and for any, or no, reason. The district court held, *inter alia,* as follows: (1) the agreement did not provide for post-termination commissions because such commissions remained in effect only as long as Mr. Chase continued to act as defendants' sales agent and (2) Mr. Chase's belief that he should get post-termination commissions if he was involuntarily terminated was not consistent with the terms of the contract or allowable pursuant to a "procuring cause" theory of recovery. The trial court noted that "Michigan's parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement.[5]

---

[3]At the trial level, defendants also claimed Mr. Chase had been overpaid commissions in the past, but the issue was not pursued on appeal.

[4]The district court found that defendants owed some, but not all, of the claimed pre-termination commissions.

[5]The agreement included an integration clause, which provided as follows: "This Agreement replaces any prior written or oral agreements of employment which may exist between you and Matsu Manufacturing or any of its affiliates."

5

On January 26, 2004, plaintiffs were granted leave to file a motion to amend the complaint to state a claim under the MSRA. An amended complaint was filed on February 13, 2004, and defendants were ultimately held liable for the statutory penalty for unpaid commissions under the MSRA. Defendants have cross-appealed from the district court's order allowing the amendment. A final judgment in the case was entered on April 19, 2004.

The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) (diversity). Mr. Chase is a Michigan resident and his business is a Michigan corporation with its principal place of business in that state. Defendants are Canadian corporations. The amount in controversy exceeds $75,000. Because this is a diversity action, the substantive law of Michigan applies. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497 (1941); *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). This Court must follow and apply Michigan law in accordance with the controlling decisions of the Supreme Court of Michigan. *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir. 1994).

This Court reviews *de novo* the grant of summary judgment by a district court. *See Crockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists unless, viewing the evidence in the light most favorable to the non-moving party, "a reasonable jury could return a verdict for [that] party." *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 801 (6th Cir. 2002) (quoting *Cockrel*, 270 F.3d at 1048).

The decision of a district court to grant a motion for leave to amend is reviewed for abuse of discretion. *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 459 (6th Cir. 2001). Abuse of discretion review requires reversal only if the district court incorrectly applied the law or relied on clearly erroneous findings of fact. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

A court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994). The court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their "ordinary and natural meaning." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (citing *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993)). If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing. *Birchcrest Bldg. Co. v. Plaskove*, 369 Mich. 631, 120 N.W.2d 819, 823 (1963).

## II. Terminable At-Will

The district court held that "Chase's September 1, 1994 contract was an indefinite term at-will contract" and then noted that "either party to an at-will contract may terminate the contract at any time for any or no reason." Plaintiffs claim the district court erred in ruling that the parties' contract was "at-will." They assert Mr. Chase's term of employment was indefinite, but that the agreement specifically defined the circumstances under which plaintiffs' entitlement to commissions could cease. Thus, plaintiffs contend the payment terms were not terminable "at-will" without consequences.

Employment contracts for an indefinite period are presumptively terminable at the will of either party for any reason or for no reason at all. *Lynas v. Maxwell Farms*, 279 Mich. 684, 687, 273 N.W. 315 (1937). As noted by defendants, the agreement with plaintiffs did not set out its term, duration, or provide for the manner by which it could be terminated. Under those circumstances, as a matter of law, the agreement was terminable at will by either defendants or plaintiffs. *Lichnovsky v. Ziebart Int'l Corp.*, 414 Mich. 228, 242, 324 N.W.2d 732 (1982) ("An agreement which fails to provide for the term, duration or manner of termination is terminable at the will of either party"). Thus, the district court properly found defendants were not precluded from terminating Mr. Chase effective December 31, 2001.

## III. Prevented From Performing

8

The parties' sales commission agreement states that plaintiffs shall be entitled to commissions "as long as Mr. Chase continues to act as the exclusive sales agent for Matsu Manufacturing" and that "if Mr. Chase becomes inactive in the sales management activities surrounding Matsu Manufacturing, his commissions on new business will cease to be paid." Plaintiffs posit the argument that defendants were precluded from "preventing" Mr. Chase from performing under the agreement by terminating him. They assert it is an implied condition of every contract that one party will not prevent performance by the other party, and that a contracting party who prevents the other party from performing under the contract "cannot urge or avail himself of the nonperformance about which he himself has brought." *See* 17A Am. Jur. 2d, *Contracts*, § 702, 703. Michigan law similarly holds that where conditions exist in a contract, a party to the contract may not avoid liability by relying on the failure of a condition precedent where that party has caused the failure. *Lee v. Desenberg*, 2 Mich. App. 365, 139 N.W.2d 916 (1966); *Ihlenfeldt v. Guastella*, 42 Mich. App. 384, 202 N.W.2d 327 (1972). Plaintiffs therefore assert that because the contract did not mention the possibility of involuntary termination of Mr. Chase's employment and did not have any sales growth or quota provisions, defendants were irrevocably bound by the implied obligation to not prevent plaintiffs from performing under the agreement. Accordingly, plaintiffs claim defendants could not "inactivate" Mr. Chase and then benefit from his failure to be "active" by not paying him commissions. Plaintiffs claim Mr. Chase could only become "inactive" through some means outside defendants' control, *i.e.*, by his voluntary retirement or his inability to perform because of illness, disability or death.

9

As noted previously, because the agreement was terminable at will, either party could terminate it at any time. Further, there is no "prevention doctrine" entitlement where one party to an agreement engages in action that it is legally authorized to take. *Shear v. National Rifle Association*, 606 F.2d 1251, 1256 (D.C. Cir. 1979); 3A *Corbin on Contracts*, § 767 n. 97; Restatement, Contracts, § 315. Therefore, the district court properly found that defendants were not precluded from terminating Mr. Chase and thereby discontinuing his right to sales commissions.

## IV. Post-Termination Commissions

### A. Procuring Cause

Plaintiffs assert that when a contract is silent on whether an agent is entitled to receive post-termination commissions, the agent is entitled to receive such commissions where the agent was the "procuring cause" of the sale. See *Reed v. Kurdziel*, 352 Mich. 287, 89 N.W.2d 479 (1958). They argue that the district court's reliance on *Fernandez v. Powerquest Boats, Inc.*, 798 F.Supp. 458 (W.D. Mich. 1992) to bar Mr. Chase's post-termination commissions is misplaced. Plaintiffs emphasize that in *Fernandez,* the parties' contract was oral and required the agent to continue to service the account to be eligible

for commissions; in the instant case, plaintiffs note Mr. Chase was not obligated to service

the GM contracts. However, as noted by defendants, the agreement before the Court is

not silent on the issue of post-termination commissions; rather, it expressly provides that

plaintiffs' rights to commissions ceased once Mr. Chase was no longer acting as

defendants' sales agent or in management. Thus, the district court properly determined

that Michigan's "procuring cause" doctrine was inapplicable under the facts of this case.[6]

### B. Life Of The Part

Plaintiffs argue that it is an industry custom to pay commissions for "the life of a

part" and that it was Mr. Chase's understanding of the contract that even if defendants

terminated him, he would still receive such commissions. He indicates that when he was

fired, numerous contracts with GM were still in effect, providing business to defendants.

On the contrary, defendants contend the agreement expressly carved out only one narrow

exception in which commissions were payable for the "life of the part," which was in the

event that Mr. Chase was unable to perform sales activities because of his incapacity or

death.

---

[6]An agent who participates in the negotiation and secures the agreement of a given contract of sale is the "procuring cause." *See Roberts Associates, Inc. v. Blazer Int'l Corp.*, 741 F.Supp. 650, 653 (E.D. Mich. 1990).

Generally, "oral evidence of prior or contemporaneous understandings is inadmissible to vary or contradict an unambiguous writing which is intended to memorialize the complete agreement between the parties." *Roberts Associates, Inc. v. Blazer Int'l Corp.*, 741 F.Supp. 650, 654 (E.D. Mich. 1990). Under Michigan law, the integration language of the written agreement conclusively establishes the finality and completeness of the written agreement. *See Cook v. Little Caesar Enterprises, Inc.*, 210 F.3d 653, 656 (6th Cir. 2000). This Court has previously held that "Michigan's parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement." *Wonderland Shopping Center Venture Limited Partnership v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085 (6th Cir. 2001)(applying Michigan law). The district court therefore correctly held that Mr. Chase's subjective understanding of the agreement "cannot be relied upon to determine the parties' intent because the words of the agreement are clear and unambiguous, and have a definite meaning that does not support Chase's interpretation." Accordingly, the district court properly interpreted the written agreement to conclude that plaintiffs are not entitled to "life of the part" commissions.

### C. "New Business"

The agreement between the parties noted that if Mr. Chase became inactive, "his commissions on new business will cease to be paid." While we have found that the district court correctly determined that plaintiffs are not entitled to any post-termination

12

commissions, the Court notes that if the "new business" clause was construed as plaintiffs contend, it would be surplusage, as the agreement entitles plaintiffs to commissions only on business associated with Mr. Chase's sales activities. *See Union Inv. Co. v. Fid. & Deposit Co. of Md.*, 549 F.2d 1107, 1110 (6th Cir. 1977) ("A contract will not be construed so as to reject any words as surplusage if they reasonably can be given meaning") (citing *Vary v. Shea*, 36 Mich. 388, 398 (1877)). Thus, the only reasonable meaning the phrase "new business" could have is continuing revenues on parts programs that Mr. Chase sold while he was an active agent, not new sales of parts made after he stopped being an active sales representative for defendants. The only commissions that conceivably could have been due to Mr. Chase were commissions on sales for which he would be entitled to commissions, *i.e.*, business in the form of sales that plaintiff was actually involved in making when he was acting as defendants' agent. Thus, plaintiffs' assertion that the phrase "new business" refers to parts sold after Mr. Chase becomes inactive (as opposed to continued revenue from parts that he previously sold) cannot be supported by the language of the agreement. *See Associated Truck Lines, Inc. v. Baer*, 346 Mich. 106, 77 N.W.2d 384 (1956).

## V. Motion To Amend

Defendants assert that plaintiffs could have asserted a claim for punitive damages under the MSRA when they filed their complaint on December 12, 2001. In the initial complaint, plaintiffs asserted claims for payment of both pre-termination and post-

13

termination commissions. Defendants argue that since the original complaint alleged an actual case or controversy concerning the non-payment of future, post-termination commissions that would not become due for several years, plaintiffs could have alleged in December 2001 that they were entitled to the remedies of the MSRA. Under the MSRA, as Mr. Chase's termination was effective December 31, 2001, defendants had until February 14, 2002 (*i.e.*, 45 days from termination) to pay any disputed commissions and avoid the statutory penalties. Defendants note, however, that plaintiffs' motion to amend was not filed until November 5, 2003, 23 months after filing the original complaint, four months after defendants moved for summary judgment, one month after the district court ruled on that motion, and without alleging any new facts of which plaintiffs were unaware when the complaint was initially filed. They assert plaintiffs' motion to amend provided no reason, justification, or excuse for the delay. Defendants argue that had plaintiffs asserted the MSRA claim in the initial complaint, or had plaintiffs timely moved for leave to amend to assert such a claim, they could have tendered the commission payments and avoided the possibility of liability under the MSRA. Defendants state they consciously did not pay the disputed amount in reliance on the fact that plaintiffs were not seeking damages under the MSRA. Defendants further contend that where a motion to amend is brought late in the proceedings, the movant must justify the delay. *See Lynch v. Flex Tech, Inc.*, 463 Mich. 578, 624 N.W. 2d 180 (2001) (MSRA's double-damage provision is punitive and could not be applied retroactively because to do so would hold a defendant punitively liable even

14

though the defendant would never have had the opportunity to avoid the penalty). *Id.*, 463 Mich. at 586.

Leave to file an amended complaint shall be "freely given when justice so requires." Fed. R. Civ. P.15(a). The determination of whether the circumstances of a case are such that justice would require the allowance of an amendment is committed to the sound discretion of the district court. *Hayden v. Ford Motor Co.*, 497 F.2d 1292, 1294 (6th Cir. 1974). When considering a motion to amend, a court should be guided by the underlying purpose of allowing amendments to facilitate a decision on the merits, rather than a decision based on procedural technicalities. *Foman v. Davis*, 371 U.S. 178, 181 (1962). Delay alone is an insufficient reason to deny a motion to amend pleadings; rather, the critical factors are notice and substantial prejudice. *Estes v. Kentucky Utilities Co.*, 636 F.2d 1131, 1134 (6th Cir. 1980); *Moore v. City of Paducah*, 790 F.2d 557, 561-62 (6th Cir. 1986). However, when an amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999). The district court abuses its discretion when it fails to state the basis for its decision or fails to consider the competing interests of the parties and likelihood of prejudice to the opponent. *See, e.g., Foman*, 371 U.S. at 182.

M.C.L. § 600.2961(4) imposes a duty on an employer to pay sales commissions to a terminated sales representative within forty-five days of the date of the termination or post-termination accrual. An employer who intentionally violates this subsection is liable for "an amount equal to 2 times the amount of commissions due but not paid as required by this section" or actual damages plus $100,000, whichever is less. M.C.L. § 600.2961(5). The plain language of the statute requires only that the principal purposefully fail to pay a commission when due. The statute does not require evidence of bad faith before double damages, as provided in the statute, may be imposed. *Henes v. Continental Biomass Industries, Inc.*, 468 Mich. 109, 659 N.W.2d 597 (2003). Accordingly, under the clear language of the statute, if a principal deliberately fails to pay a commission when due, it is liable for double damages under the statute, even if the principal did not believe, reasonably or otherwise, that the commission was owed. There is no good faith defense under the statute. In regard to the MSRA, the Michigan Supreme Court has noted as follows:

> The double-damages penalty provision of the [MSRA] is irrefutably punitive rather than compensatory in the sense that it provides for an award of damages above and beyond that necessary to make plaintiff whole under the contract. However, that conclusion is not controlling or even relevant to the proper construction of this unambiguous statute. The clear and unambiguous language of the statute penalizes intentional failure to pay, without regard to the motivation of the principal. Under the language of the statute, it appears that the only cognizable defense to a double-damages claim is if the failure to pay the commission were based on inadvertence or oversight. The Legislature is certainly within its power to award "punitive-type" damages for such actions if it chooses to do. The imposition of a contrary judicial gloss is inappropriate where the Legislature has clearly expressed its intentions in the words of the statute. *Nawrocki v. Macomb Co. Comm.*, 468 Mich. 143, 150, 615 N.W.2d 702 (2000); *Chmielewski [v.*

16

> *Xermac, Inc.*, 457 Mich. 593, 606, 580 N.W.2d 817 (Mich. 1998)]; *People v. Gilbert*, 414 Mich. 191, 324 N.W.2d 834 (1982).

*Id.* at 602-603.

In the matter before us, the issue of the MSRA claim was raised in plaintiffs' motion for summary judgment. The district court, however, did not rule on plaintiffs' claim under the MSRA, because the court found the claim had not been pleaded as a separate claim. The district court suggested plaintiffs move to file an amended complaint stating such a claim, which plaintiffs subsequently filed. In allowing the amendment, the district court determined that plaintiffs could not have asserted the MSRA claim when they filed their complaint on December 12, 2001, finding that no claim would have arisen under the MSRA until 45 days after the date of termination (February 15, 2002).

In the view of the Court, by allowing the amendment, the district court furthered the state law by giving effect to the statute and the policy upon which it is founded. Defendants acknowledge that they were cognizant of the statute and were fully aware they could have avoided any possible penalty under the MSRA by paying plaintiffs the commissions allegedly due. Thus, while the risk remained that plaintiffs might bring a claim under the MSRA, defendants consciously chose not to pay the commissions. Their liability for "penalty" damages under the MSRA was fixed in early 2002. Once the 45-day period elapsed, they had no defense to the statutory penalty except to prove the commissions were not due. In regard to the amendment, it introduced no new facts, required no additional discovery and made no material difference in trial preparations.

17

Within its discretion, the district court properly held that plaintiffs acted "in good faith" and not as "the result of bad faith, dilatory motive, or an intent to harass" in failing to assert the MSRA claim sooner, as plaintiffs believed they were not required to allege the claim separate from their breach of contract claim. This Court notes that as the commissions at issue are ones allegedly due on or before December 31, 2001, the lengthy delay in amending the complaint clearly did not prejudice defendants, as the period in which to make the payments has long since expired.

## VI. Conclusion

For the above reasons, the orders of the district court granting in part and denying in part the summary judgment motions of the parties and allowing plaintiffs to amend the complaint are **AFFIRMED**.